OSCAR BRYANT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Bryant v. Commissioner
Docket No. 3727-79.
United States Tax Court
T.C. Memo 1982-169; 1982 Tax Ct. Memo LEXIS 577; 43 T.C.M. (CCH) 967; T.C.M. (RIA) 82169; March 31, 1982. *577 1. Held, petitioner is not entitled to a bad debt deduction for 1973. 2. Held,further, the entire gain realized by petitioner on the sale of a farm and improvements to Dr. Barnes in 1973 is taxable as long-term capital gain. No gain was realized on the sale of sec. 1245 property. 3. Amount and character of gain realized by petitioners on sale of equipment at auction determined. 4. Held, petitioner is liable for the addition to tax imposed under sec. 6653(a), I.R.C. 1954, for each of the years 1972, 1973, and 1974. 5. Held, petitioner is liable for the addition to tax imposed under sec. 6651(a)(1), I.R.C. 1954, for each of the years 1972, 1973, and 1974. Ray K. Babb, Jr., for the petitioner. Juandell D. Glass, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in, and additions to, petitioner's Federal income tax as follows: Taxable year
Additions to tax
ending Dec. 31,
Deficiency
sec. 6653(a) [1] *578 sec. 6651(a)(1)(A) [2]
1972
$ 1,567.91
$ 78.40
$ 361.98
1973
45,140.43
2,257.02
11,285.11
1974
6,579.86
328.99
657.99 After numerous concessions by the parties, 2a *579 which shall be taken into consideration in the Rule 155 computation, the issues remaining are: (1) Whether for the taxable year 1973 petitioner is entitled to a bad debt loss deduction under section 166, [3](2) the amount and character of gain realized by petitioner in the taxable year 1973 on the sale of certain real and personal property, (3) whether for each of the taxable years in issue petitioner is liable for an addition to tax imposed under section 6653(a) for negligence or intentional disregard of the rules and regulations, and (4) whether for each of the taxable years in issue petitioner is liable for an addition to tax imposed under section 6651(a)(1) for failure to file a timely income tax return. [4] FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of facts and exhibits attached thereto are incoporated herein by reference. Petitioner Oscar Bryant (hereinafter petitioner) resided in Hollis, Okla., at the time of filing the petition herein. He filed a joint Federal income tax return with his wife, Jessie Bryant, for the taxable years 1972 and 1973 on November 25, 1975, and for the taxable year 1974 on June 5, 1975. [5] Each of these returns was filed with the Internal Revenue Service, Austin, Tex.[6] *580 Beginning in 1919, and continuing throughout the taxable years in issue, petitioner operated a gas station which sold to both retail and wholesale customers. Since the 1930's petitioner also has been intermittently involved in the cattle-ranching and farming business. In the mid-1960's petitioner became involved in the operation of a feed lot and feed mill. This operation was located on a 983-acre farm owned by petitioner (hereinafter referred to as the Barnes property). In December 1971, petitioner ceased all business activities relating to the cattle, farming, and feed lot and feed mill operations. Petitioner did not maintain books and records of income and expenses in connection with either his farming or feed lot operations, although he did for his gas station business. Petitioner did not keep a record of any of the machinery or other equipment acquired in connection with his farming and feed lot operations, nor did he maintain depreciation schedules for such equipment. The feed lot business in which *581 petitioner was engaged until December 1971, involved the purchase and sale of cattle. The cattle were purchased at a time when they weighed approximately 400 to 500 pounds. They then were put on a special diet of feed consisting of grain and ensilage until they reached a weight of 800 to 900 pounds, at which time they would be sold. In connection with this business, petitioner also fed cattle owned by others, who would pay petitioner to "fatten" their cattle. The feed mill was where the feed was prepared by mixing the grain and ensilage, cooking the mixture, and then crushing it. In 1967, petitioner was in need of financial help with respect to the feed lot business. His brother, R. B. Bryant (hereinafter R.B.), agreed to help him out and thereafter cosigned on a series of advancements petitioner received from the Altus Production Credit Association (hereinafter referred to as Altus), between February 5, 1967, and December 29, 1971. The loan account statement received monthly by petitioner bore both his and R.B.'s names. Thereafter, R.B. became involved in all phases of the feed lot operation and understood that he was to receive 50 percent of the profits from the operation after *582 the debts had been paid. The feed lot operation suffered losses during the years 1967 thru 1971. R.B. deducted one-half of all these losses on his income tax returns. However, R.B. never examined any books and records or received any financial statements in connection with the feed lot operation. The amount deducted on his income tax return each year was determined by R.B.'s "tax lady" who would calculate the deduction from the Altus loan account statements she had been furnished. Sometime during 1973 Atlus began pressuring petitioner for the repayment of the outstanding balance of amounts loaned in connection with the feed lot operation. Altus met together with both R.B. and petitioner on one occasion to discuss repayment of the advancements, and on another occasion with petitioner alone. At the latter meeting, Atlus threatened to sue petitioner if he did not begin paying off the debt owed. At that time $ 248,084.11 was owed to Altus. In order to pay off the Altus debt, petitioner decided to sell the Barnes property. Subsequently, in September 1973, Dr. Barnes agreed to purchase the Barnes property and the improvements thereon for $ 366,100, taking such property subject to *583 the Altus debt. Petitioners used the proceeds of sale to pay off the Altus debt. R.B. considered himself responsible for one-half of the $ 248,000 Altus debt which had been satisfied by petitioner. Therefore, on October 10, 1973, he transferred to petitioner a one-half interest in 240 acres of land which he owned. [7] The deed in respect of this transfer was not filed until April 10, 1974. Sometime thereafter this land was sold for $ 68,000 and the proceeds were split equally between petitioner and R.B. In addition to the land, R.B. owned his home and six lots located directly in front of it. [8]
Petitioner did not initially consider that R.B. owed him anything as a result of his transfer of the Barnes property to satisfy the Altus debt. Petitioner at first refused to take the deed to the one-half interest in R.B.'s land, but did eventually accept it after R.B. insisted he take it. Petitioner had never considered taking any legal action concerning *584 the amount R.B. owed him either prior to or after R.B. gave him the above deed. He also stated that even if he had not been given the deed, he would not have sued R.B. for one-half of the Altus debt. Petitioner claimed on brief that he is entitled to a business bad debt deduction in the amount of $ 110,000 [9] for the taxable year 1973, as the difference in one-half the amount of the joint debt owed to Altus and satisfied by petitioner, and the fair market value of the one-half interest in land transferred to petitioner from R.B. Respondent denies the deductibility of this loss. At the time the Barnes property was sold in 1973, it was improved by three small houses, one small and one large barn, the feed lot and mill, fences and various irrigation wells and pipelines. The total sales price for the land and improvements was $ 366,100. The cost or adjusted basis was $ 108,734.69 for the land, $ 1,283.51 for the buildings and $ 61,432.91 for the remaining improvements. Petitioner did not report this sale on his *585 income tax return for the taxable year 1973. However, during the audit of his 1973 income tax return in December 1975, this sale was discovered by an Internal Revenue Service agent, and at that time the Barnes property and the improvements thereon were examined for valuation and allocation of the sales price as of the time of sale by Ronald Summers, an evaluation engineer for the Internal Revenue Service. [10] He personally inspected the condition of the fences, pipelines, and wells, and examined the barns, houses, and feed lot and mill located on the property. In addition to personally examining the property, Summers obtained comparable sales figures from the county records and soil production figures from the local soil conservation office. Based on his study, Summers prepared a valuation report on May 26, 1976, in which he allocated the sales price for the Barnes property as follows: Value
Recommended
Land
$ 294,900
Fences
4,002
Irrigation wells and pipes
31,997
Feed lot and mill
20,000
Large barn
11,997
Small barn
1,203
Two small houses
2,001
Total
366,100
His allocation was made by determining *586 the ratio of the value of the land, as he determined it to the value of the improvements, and applying such ratio to the actual sales price of the property. In concluding that the land had a value of $ 294,900, Summers took into consideration that petitioner had sold the property under pressure from Altus for repayment of the outstanding debt of $ 248,000. In preparation for trial, petitioner employed Donald Barker to value the Barnes property as of the time of its sale in 1973. Barker did not, however, personally view the property or prepare his report until October 20, 1980, the day before trial. His valuation report was based on his personal inspection of the property, and comparable sales information obtained from Summers' report. Much of the language used in Barker's report came directly from Summers' report because Barker had "very little disagreement" with that report. In his report Barker allocated the sales price between land and improvements, as described in his report, as follows: Value
Land
$ 307,100.00
Fences
3,687.50
Irrigation well
and pipelines
28,025.00
Feed lot and mill
14,750.00
Large barn
11,062.50
Houses
1,475.00
Total
$ 366,100   The "Summary Recommendations", however, *587 located at the beginning of the report indicated an allocation of $ 315,944 for land and $ 50,156 for improvements. This allocation was without explanation other than he valued the land at $ 320 per acre. [11] In arriving at this value for the land, Barker took into consideration the fact that petitioner had sold the property under pressure from Altus for repayment of the outstanding debt owed to it. The language used in his report in this regard was exactly the same as that used in Summers' report. In his notice of deficiency, respondent allocated the sales price and determined gain on the sale of the Barnes property as follows: Land
Equipment [12]
Buildings
Sales price
$ 192,000.00
$ 149,100.00
$ 25,000.00
Cost or adjusted basis
108,734.69
61,432.91
1,283.51
Gain
83,265.31
87,667.09
23,716.49
His allocation of the sales price was not based on the valuation report prepared by Summers, but rather was based on the allocation used by the purchaser, Barnes. He also determined that the gain on the sale of the equipment was subject to *588 recapture pursuant to section 1245 to the extent of $ 55,435.83, which he therefore determined to be ordinary income. In 1973, petitioner sold numerous items of farming equipment for a total of $ 56,759.50 at an auction sale. He incurred selling costs of $ 2,138.50 at the sale. Petitioner had not maintained any books or records as to the acquisition date of the assets sold or their original cost, and no depreciation schedule for such assets had ever been maintained. Petitioner, nearly 84 years old at the time of trial, could not remember the exact year in which each of the assets sold at the auction sale were acquired. Petitioner did however offer the following estimates for the year of acquisition of the following equipment, as described in the auctioner's report: Auction
sales
Date
Equipment
price
acquired
1. Two 3-point Ferguson rakes
$ 200
1940's
2. Grassland drill
580
1940's
3. Hamy chisel (wheat plow)
120
1940's
4. 3-point Hamy chisel (wheat plow)
50
1940's
5. Tamdem desk
850
1940's
6. Dosier blade and front and loader
120
1940's
7. John Deere chisel plow
2,500
late 1950's
8. 4-row knife sledhoes and desk
270
1940's
9. Ferguson tractor and 20-30 kit
610
1948
10. West one-way
130
1950's
11. Four-wheel trailer
350
1949
12. Anhydrous application tank
180
late 1940's
13. Tandem desk
510
1950's
14. Helex wagon
160
late 1940's
15. 30 Ferguson tractor
1,375
late 1940's
16. Gradder yellow big
250
1930's
17. Chisel with cable
140
late 1940's
18. 3-point harrow
100
1940's
19. 6500 Cheve truck
1,250
late 1930's
20. Cabover truck
720
late 1940's
21. 1937 Ford truck
130
1930's
22. MF-85 Massey Ferguson tractor
975
1930's
23. 8-row lister
2,500
1950's
24. GMC truck with lift
130
late 1930's/early
1940's
25. Grass sprigger
500
late 1940's
26. Digger
75
1930's
27. Ferguson 30 tractor with loader
1,175
late 1930's/early
1940's
Total
15,950
*589 Petitioner entered into evidence seven separate checks totaling $ 17,894.43. These checks were drawn between April 16, 1968, and November 8, 1970, and were for payments on various equipment that petitioner had purchased between 1968 and 1970.
Petitioner did not report any gain from the auction sale on his 1973 income tax return. In his notice of deficiency, respondent determined that petitioner had realized a gain of $ 54,621 on the auction sale. [13] In so doing, he determined that none of the assets sold had any remaining basis at the time of sale, and that the entire gain was subject to recapture pursuant to section 1245 and was therefore ordinary income. OPINION The first issue is whether for the taxable year 1973 petitioner is entitled to a business had debt loss deduction pursuant to section 166(a)(1). Entitlement to a deduction under this section requires that the debt have become wholly worthless as of the end of 1973, [14] and have been created or acquired in connection with *590 or incurred in, a trade or business. [15]
Petitioner maintains that he and R.B. were jointly liable as partners for the outstanding debt owed to Altus. He claims that when he satisfied the Altus debt by selling the Barnes property, R.B. became indebted to him for one-half the amount of such debt. Further he claims that the one-half interest in the 240 acres transferred to him by R.B. in satisfaction of this debt was worth only $ 34,000 and was all that petitioner could ever reasonably expect to recover on the amount "owed" by R.B. Petitioner therefore maintains that the difference between one-half of the joint debt owed to Altus and *591 paid by petitioner ($ 288,084.11) [16] and the fair market value of the one-half interest transferred to petitioner is a bad debt for which he is entitled to a deduction. Respondent maintains that petitioner has failed to prove that he and R.B. had engaged in a partnership with respect to the feed lot operation, and that the debt was not therefore held jointly as a partnership liability, but rather was petitioner's alone. Alternatively, he argues that even if R.B. was indebted to petitioner, such debt had not become worthless by the end of 1973. Because we agree with respondent's alternative argument, we do not decide whether R.B. was in fact indebted to petitioner by virtue of petitioner's payoff of the Altus debt; we have assumed the debt existed for purposes of our opinion. [17] *592 *593 Whether a debt has become wholly worthless is determined by an objective standard which is met by a showing of identifiable events which form the basis of reasonable grounds for abandoning any hope of future recovery. Dallmeyer v. Commissioner,14 T.C. 1282, 1291 (1959). The subjective good faith opinion of petitioner is insufficient. Fox v. Commissioner,50 T.C. 813 (1968), affd. per curiam     F.2d     (9th Cir., Mar. 9, 1970, 25 AFTR 2d 70-891, 70-1 USTC par. 9373). Entitlement to a bad debt deduction for the taxable year 1973 requires that petitioner demonstrate that the debt in issue had some value at the time created, and that it had become worthless by the end of the taxable year 1973. In this regard, "worthlessness" means lack of potential value as well as any current liquid value. Dustin v. Commissioner,53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). Here, petitioner has not shown the occurrence of any identifiable events which would form the basis of reasonable grounds for *594 abandoning any hope for future recovery. The only event occurring during 1973 was the transfer by R.B. of a one-half interest in 240 acres to petitioner. This not only indicates that the debt was not worthless, but that R.B. had assets from which he could pay such debt. Petitioner, however, claims that R.B. had no other assets from which he could satisfy the debt owed to him other than the 240 acres. Therefore, he claims he is entitled to a bad debt deduction to the extent the debt owed exceeded the fair market value of the interest received. The facts, however, are contrary to petitioner's assertion. First, there was no showing of what the fair market value of the interest received from R.B. was at the time transferred. For all we know, the value of this interest exceeded the amount of the debt, and no debt remained to become "bad". Second, in addition to the one-half interest which R.B. transferred, he owned the other one-half interest in this property, a home, and 6 lots. A compromise with a solvent debtor does not support a deduction for worthlessness, see Davies v. Commissioner,54 T.C. 170, 176 (1970), and from the evidence presented, R.B. was solvent. Finally, it is *595 axiomatic that a taxpayer must exhaust all usual and reasonable means of collecting a debt before worthlessness can be determined. See Spratt v. Commissioner,43 B.T.A. 503, 513 (1941). [18] Petitioner here made no attempts whatsoever to collect on the debt, and indeed received the one-half interest only after R.B. had insisted that he take it. Based on the evidence adduced and the record as a whole, we find that petitioner has failed to show that the debt became worthless at any time during 1973, and accordingly hold for respondent. The next issue is the extent to which the gain realized by petitioner during the taxable year 1973 on the sale of the Barnes property is entitled to long-term capital gains treatment. [19] Respondent determined that a part of the improvements qualified as section 1245 property and any gain therefrom is ordinary income. Resolution of this issue depends upon the proper allocation of the sales price between land, improvements, and improvements that qualify as section 1245 property, based on their respective *596 fair market values. There is no dispute that the amount realized on the sale of the Barnes property, together with the improvements thereon, was $ 366,100 and the total adjusted basis in the property sold was $ 171,451.11, 19a thereby resulting in a gain realized of $ 194,658.89. See sec. 1001(a). Petitioner claims that $ 315,944 of the sales price should be allocated to land and $ 50,156 to improvements. This allocation would result in a long-term capital gain on the sale of the land of $ 207,209.31 and a long-term capital loss on the sale of the improvements of $ 12,560.42, or a net long-term capital gain from this sale of $ 194.648.89. In his notice of deficiency, respondent determined the sales price should be allocated $ 192,000 to land, $ 25,000 to buildings, and $ 149,000 to the remaining improvements. *597 While the total gain realized pursuant to this allocation is unchanged, respondent determined that the gain attributable to the improvements other than buildings was subject to recapture pursuant to section 1245 in the amount of $ 55,435.83, [20] and was therefore determined to be ordinary income. Respondent claims that petitioner has failed to carry his burden of proving error in respondent's determination, and that therefore such determination must be sustained. We disagree. Respondent's determination of the fair market value of the land and improvements in question and the allocation of the sales price pursuant thereto is presumptively correct, and petitioner bears the burden of proving a different allocation should attach. Welch v. Helvering290 U.S. 111 (1933); Rule 142(a). [21]
In our view, however, the most reliable evidence of the proper allocation of the sales price was Summers' valuation report. This *598 report was based on a detailed study of the property sold, not too long after it was sold. Summers personally inspected the fences, the irrigation wells and pipelines, the large and small barns, and the houses located on the property. In making his valuation report, he searched through the county records to obtain comparable sales figures and also obtained soil production figures from the local soil conservation office. Summers had been a valuation engineer with the Internal Revenue Service for 5 years at the time he prepared his valuation report on the Barnes property, and we have no reason to believe he was not otherwise qualified to do so. We also find his method of allocating the sales price to be reasonable. Notwithstanding the valuation report prepared by his agent, Summers, respondent's determination was based on the allocation of the sales price used by the purchaser, Barnes. Normally, however, the purchaser would be desirous of allocating more of the sales price to the improvements rather than the land since this would afford him greater depreciation deductions. See section 167. Respondent's reliance on the allocation used by Barnes, the purchaser of the property, *599 was not explained, nor was his reluctance to rely on his own agent's report. He apparently choose that allocation which would result in a portion of the gain realized on this sale being characterized as ordinary income. We do not find respondent's allocation to be reasonable. The valuation report prepared by Barker on behalf of petitioner in preparation for trial appears to have been nothing more than a copy of Summers' report, other than the final allocation of the sales price recommended therein. Barker adopted nearly verbatim the information provided in Summers' report; he did not view the property or prepare his valuation report until the day before trial; and certain items sold in the Barnes sale and indicated in Summers' report were left out of Barker's report. Barker himself testified that he had "very little disagreement" with the information provided in Summer's report, although he then proceeded to allocate the sales price in a different manner. Based on the testimony given and the evidence presented, we think that the report prepared by Summers is more credible than the report prepared by Barker, and we adopt his recommendations as the proper allocation of the sales *600 price. Pursuant to Summers' report, the sales price was allocated among land, buildings, and other improvements as follows, resulting in gain (loss) realized as indicated: Other
Land
improvements
Buildings
Sales price
$ 294,900.00
$ 35,999.00 $ 35,201.00
Cost or adjusted basis
108,734.69
61,432.91 1,283.51
Gain (loss)
186,165.31
(25,433.91)
33,917.49
This allocation results in a net loss on the section 1245 property (included in other improvements) and a net long-term capital gain of $ 194,648.89. See sec. 1222(7). Therefore, based on all evidence presented and the record as a whole, we find that the entire gain realized on the Barnes sale is entitled to long-term capital gains treatment. The next issue is the amount and character of the gain realized by petitioner during the taxable year 1973 from the auction sale. There is no dispute that the amount realized on this sale was $ 56,759.50 and that petitioner incurred selling costs in connection therewith of $ 2,138.05. Petitioner maintains that certain items of equipment sold at the auction sale had been acquired and fully depreciated prior to 1962 and, therefore, none of the gain realized is subject to the recapture rules of section 1245. [22] *601 He further maintains that some of the equipment sold had basis remaining at the time of sale which should offset the amount realized on such sale thereby decreasing the gain realized. Respondent maintains that all of the property sold was acquired *602 after 1961 and was fully depreciated by the time of this sale and therefore the entire amount realized, offset only by certain selling expenses, is subject to recapture pursuant to section 1245 and is therefore ordinary income. Respondent's determination is presumptively correct, and the burden of proving that a different amount and character of gain was realized on the auction sale is on petitioner. Welch v. Helvering,supra.Rule 142(a). With regard to the amount of gain realized on this sale, petitioner's claim that some of the assets sold at the auction sale had remaining basis to offset the amount realized is unsupported by the evidence. The only evidence presented in this context was seven cancelled checks representing amounts expended for various equipment manufactured by John Deere & Co., which had been purchased between 1968 and 1971. However, no evidence was presented as to the initial cost of such equipment, their respective useful lives, or the method of depreciation used with respect to such equipment. We have no way of calculating the basis, if any, remaining at the time of sale of these assets. See generally sections 167, 1012, 1011(a) and 1016(a)(2). The evidence *603 presented is not sufficient to refute respondent's determination as to the amount of gain realized on the auction sale and we therefore hold for respondent. With regard to the character of the gain realized, petitioner claimed on brief that $ 15,950 of such gain was attributable to equipment which had been acquired and depreciated prior to 1962, and is not, therefore, subject to section 1245 recapture. Petitioner, however, neither maintained records of the dates that the equipment sold were acquired or the initial cost of such equipment, or a depreciation schedule for such equipment. The only evidence presented in this connection was testimony by petitioner as to the acquisition date of 26 of the items sold. Each of these items, according to petitioner, were acquired anywhere from the "1930's" to the "late 1950's". It is apparent that petitioner's testimony was extremely vague, and we note that, although petitioner had an excellent memory for a man of nearly 84 years, he could not recall with any certainty events which had occurred during the 1960's, let alone those which had occurred during the 30 years prior to that time. We do know that petitioner had been involved in farming *604 since the 1930's, and we are convinced that at least some of the equipment sold in the auction sale had been acquired and, at least to some extent, depreciated prior to 1962. Therefore, applying the so-called Cohan rule, we hold that $ 4,500 of the amount realized from the auction sale was attributable to equipment acquired and depreciated prior to 1962, and therefore is not subject to the recapture rules of section 1245. Cohan v. Commissioner,39 F.2d 540, 544 (2d Cir. 1930). To this extent, petitioner is entitled to capital gains treatment. The next issue is whether for each of the taxable years in issue, petitioner is liable for an addition to tax imposed under section 6653(a) for underpayment of tax due to negligence or intentional disregard of the rules and regulations. Petitioner has the burden of proving that this addition should not be imposed. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Rule 142(a). Petitioner maintains that his underpayment of tax for each of the years in issue was due to his old age, his poor health, and his poor financial condition resulting from the losses suffered in his feed lot operation. Because his bookkeeper of 28 years had died in *605 1971, petitioner had to rely on his "own work" to determine his income, losses and expenses for the years in issue, and he claims that the totality of these circumstances constitutes reasonable grounds for underpayment of the tax due for each of the taxable years in issue. We disagree. Petitioner has admittedly failed to maintain any books and records with respect to the property sold at both the Barnes and auction sales. This is in direct contravention of section 6001 and the regulations thereunder which require that a taxpayer maintain adequate records of his income and expenses. Further, the fact that petitioner's bookkeeper had died is of no help to petitioner since one cannot avoid the duty of filing an accurate tax return by transferring that responsibility onto an agent. Bailey v. Commissioner,21 T.C. 678, 687 (1954). It is noteworthy that petitioner failed to report certain other amounts in income for each of the taxable years in issue, although these amounts were conceded by petitioner and are not now in issue. It is true that petitioner was quite elderly during the taxable years in issue, but that factor alone will not negate what was otherwise negligent conduct on *606 his part. In view of the evidence presented, as find that petitioner has not met his burden and, accordingly, we sustain respondent's determination.
The next issue is whether for each of the taxable years in issue petitioner is liable for additions to tax imposed under section 6651(a)(1) for failure to file a timely income tax return. Petitioner maintains that he is not liable for an addition to tax imposed under section 6651(a)(1) for any of the taxable years in issue because the delay in filing his return for each of these years was due to reasonable cause. For essentially the same reasons relied on with respect to the additions to tax imposed under section 6653(a), petitioner maintained that he reasonably believed no tax was owing for any of the taxable years in issue, and that no return was required. Respondent maintains that petitioner's belief that he owed no tax during the taxable years in issue was unreasonable. He claims that petitioner could not have had any idea of the tax he owed since he did not maintain any books and records with respect to the property sold in the Barnes and auction sales. There is no dispute that petitioner filed an untimely return for each of the *607 taxable years in issue. Petitioner is therefore liable for the additions asserted herein "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." [23] *608 Because this issue was raised for the first time by an amended answer, it constitutes a "new matter", the burden of proof of which is on respondent. Rule 142(a). [24] We think that respondent has met this burden. First, as to the taxable year 1973, petitioner could not have reasonably believed that he did not realize any gain on either the Barnes or auction sales. As we have noted herein, petitioner did not maintain books or records as to the cost or acquisition dates of the properties sold in those sales and did not maintain a depreciation schedule as to those properties. Petitioner simply did not know what his gain or loss on these sales was, and until the time of the audit of the years in issue, made no attempt to determine it. Further, that petitioner's bookkeeper had died did not afford petitioner reasonable grounds for filing an untimely return since no books and records as to the property sold in the Barnes and auction sales had ever been kept. The bookkeeper would clearly have had no more information with respect to the property sold than did petitioner. Second, for each of the taxable years in issue, petitioner did maintain records as to his *609 gas station business. Although his income tax returns filed for 1972 through 1974 indicated a net loss from such business, the gross income for such years was $ 64,219.41, $ 54,944.88, and $ 21,264.34, respectively. [25] Section 6012(a)(1) provides that "every individual having for the taxable year a gross income of $ 1,000 or more" must file a return, with certain exceptions not applicable here. Therefore, even if petitioner had reasonable grounds to believe he owed no tax, which we have found he did not at least for the taxable year 1973, he did not have reasonable grounds to file an untimely return. In view of the evidence presented and the record as a whole we sustain respondent's determination on this issue. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue. 2. The additions to tax pursuant to sec. 6651(a)(1)(A)↩ were not determined in respondent's notice of deficiency, but rather were asserted in his amended answer.
2a. Although most of the issues were conceded prior to trial or in the stipulations of facts, petitioner conceded on brief to have received certain additional amounts of income claimed by respondent to have been received in each of the years in issue, less certain stipulated amounts. 3. Petitioner did not deduct a bad debt loss on his income tax return for the taxable year 1973 or for any other year in issue. This deduction was claimed for the first time by amendment to petitioner's petition. ↩
4. The amount, if any, of self-employment tax and minimum tax owed by petitioner is dependent upon resolution of the issues herein and is not otherwise in dispute.↩
5. Petitioner's wife, Jessie Bryant, was deceased as of the time of this trial and is not a party to this action. ↩
6. The income tax return filed for each of the years in issue indicated that no tax was due. Although petitioner reported a net loss on a gas station business he was engaged in, the gross income from such business for the years 1972 through 1974 was indicated to be $ 64,219.41, $ 54,944, and $ 21,264.39, respectively.
7. No evidence was presented as to the fair market value of this land at the time it was transferred, and petitioner was unaware of its value at that time. ↩
8. No evidence was presented as to the fair market value of R.B.'s home and lots.↩
9. In his amended petition, petitioner claimed he was entitled to a bad debt loss deduction of $ 104,042. It is not clear how he arrived at either of these figures. See n.16.↩
10. Summers had been employed in this capacity for approximately 5 years at the time of this examination.↩
11. However, at $ 320 per acre, the value of the land would be $ 314,560; the discrepancy was not explained.↩
12. Equipment denoted all improvements other than the buildings.↩
13. Petitioner had been unable to furnish respondent with any records which would indicate the cost of the assets sold or the date they were acquired, and no depreciation schedule had ever been maintained.↩
14. Under sec. 166(a)(2) if the debt is a business debt which becomes partially worthless during the year, a deduction may be allowed but in an amount not in excess of the amount charged off within the taxable year. Since petitioners did not "charge off" any part of the debt here involved in 1973, this provision is not applicable. Thus, to be entitled to any deduction under sec. 166↩ for 1973, petitioner must prove that the debt, whether business or nonbusiness, became wholly worthless within that year. 15. See Hubble v. Commissioner,T.C.Memo. 1981-625↩.
16. The outstanding balance owed to Altus at the time the debt was paid off was $ 248,084.11. While not entirely clear from the record, petitioner apparently claims that a $ 40,000 payment made on the debt was derived from a sale of property owned by him and that the total joint debt satisfied by petitioner was $ 288,084.11.↩
17. We have serious doubts that petitioner has carried his burden of establishing that there was a debt owing to him by his brother, R.B. A debt for purposes of sec. 166 exists only when there is a clear showing of a "debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs. Here, an analysis of the record before us reveals that all the usual indicia of a bona fide indebtedness are absent. Although no one fact is determinative, it is of material importance that there was no written evidence that the purported advance was intended to be a loan; there was no provision for interest; no provision for a security; no definite understanding as to the method or time for payment; no fixed or ascertainable maturity date; and no evidence of an understanding or promise to repay. See Rollins v. Commissioner,32 T.C. 604, 614 (1959), affd. 276 F.2d 368 (4th Cir. 1960). Moreover, intrafamily transactions are subject to rigid scrutiny and there must be an affirmative showing that there existed at the time of the transaction a real expectation of repayment and an intent to enforce collection. Clark v. Commissioner,18 T.C. 780 (1952), affd. per curiam 205 F.2d 353 (2d Cir. 1953). Petitioner here admittedly had no intent of ever enforcing collection of the supposed debt, which would belie his assertion that a debt existed. See Constantin v. Commissioner,T.C.Memo. 1966-27↩.
18. We do not mean to imply that a lawsuit is a prerequisite for a bad debt deduction, and respondent's regulations so specify. Sec. 1.166-2(b), Income Tax Regs.↩
19. There is no dispute that to the extent the gain otherwise qualifies as capital gain, it is entitled to long-term capital gains treatment.↩
19a. It was stipulated that the adjusted basis of the land was $ 108,734.69, of the buildings was $ 1,283.51, and of the remaining improvements was $ 61,432.91, but we do not know what assets are included in the category "other improvements."↩
20. We cannot determine from the record what assets were included in respondent's category of sec. 1245↩ assets, but in light of our conclusion, they need not be identified.
21. All references to the rules shall be deemed to refer to the Tax Court Rules of Practice and Procedure.↩
22. SEC. 1245. GAIN FROM DISPOSITIONS OF CERTAIN DEPRECIABLE PROPERTY. (a) General Rule.-- (1) Ordinary Income.--Except as otherwise provided in this section, if section 1245 property is disposed of during a taxable year beginning after December 31, 1962, the amount by which the lower of-- (A) the recomputed basis of the property, or (B) (i) in the case of a sale, exchange, or involuntary conversion, the amount realized, or (ii) in the case of any other disposition, the fair market value of such property, exceeds the adjusted basis of such property shall be treated as ordinary income. Such gain shall be recognized notwithstanding any other provision of this subtitle. (2) Recomputed Basis.--For purposes of this section, the term "recomputed basis" means-- (A) with respect to any property referred to in paragraph (3)(A) or (B), its adjusted basis recomputed by adding thereto all adjustments, attributable to periods after December 31, 1961.↩
23. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate. 24. See Metas v. Commissioner,T.C.Memo. 1982-36↩.
25. See sec. 1.61-3(a), Income Tax Regs.↩